UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. 06-109 (RWR) |
| : | |
| TYRONE LOFTEN : | |
| : | |
| Defendant. : | |
| : | |

**SUPPLEMENTAL MOTION TO SUPPRESS PHYSICAL EVIDENCE AND
MEMORANDUM OF POINTS AND AUTHORITIES**

The Defendant, Tyrone Loften, by and through counsel, supplements his motion of July 14, 2006 and hearing on that motion of October 25-26, 2006 for an order suppressing as evidence at trial all items seized from 229 54th Street NE, Washington, DC on or about April 7, 2005. In support of this motion, the Defendant submits the following:

**FACTUAL BACKGROUND**

1.  According to the testimony of Deputy U.S. Marshal Robert Hoffmaster at the hearing on Defendant's Motion to Suppress on October 25-26, 2006 (hereinafter "suppression hearing"), on April 7, 2005, as part of Operation Falcon, a joint effort of the Metropolitan Police Department (hereinafter "MPD"), the Drug Enforcement Agency, the United States Marshals, and the Bureau of Alcohol, Tobacco and Firearms, officers under the supervision of Deputy U.S. Marshal Hoffmaster went to a residence at 229 54th Street NE, Washington, DC in order to effect the arrest of Ms. Monica Cain, a lessee at the address.

2.      According to the testimony of Ms. Sharon Chavis, at the suppression hearing, Ms. Cain was wanted on a June 5, 2000 fugitive warrant for failure to appear in a grand larceny case in Virginia.

3.      According to the testimony of Deputy U.S. Marshal Robert Hoffmaster at the suppression hearing, he testified knocked on the front door of the residence at approximately 7:00 AM. A woman wearing a robe answered the door and Deputy U.S. Marshal Hoffmaster asked if "Angela" or "Roberta" was home. The woman said, "No, I'm Monica" and Deputy U.S. Marshal Hoffmaster, deducing that this woman was Monica Cain, quickly placed her under arrest at the open doorway to the home.

4.      According to the testimony of MPD Officer Todd Perkins at the suppression hearing, after arresting Ms. Cain, Deputy U.S. Marshal Hoffmaster then gave an order to the other eight to ten officers present to conduct a sweep.

5.      According to the testimony of MPD Officer Todd Perkins at the suppression hearing, such security sweeps are routinely conducted when arrest warrants are effected in a residence by the U.S. Marshals who "when they go in, they take over the entire house." The Marshals would conduct a security sweep of the entire residence, no matter how many stories or floors that residence occupies.

6.      According to the testimony of Deputy U.S. Marshal Robert Hoffmaster at the suppression hearing, whenever the U.S. Marshals effect an arrest warrant in a residence, "What we do is…a security sweep."

7.      According to the testimony of MPD Officer Todd Perkins at the suppression hearing, as part of the security sweep which Deputy U.S. Marshal Hoffmaster ordered, Officer Perkins quickly ascended the staircase going to the second

floor of the residence. After Officer Perkins had ascended one stair, he claims he spotted the defendant, Tyrone Loften exiting from an upstairs bedroom immediately to the right of the top of the staircase. Officer Perkins handed Mr. Loften off to other officers down the stairwell. Officer Perkins then continued upstairs to see if anyone else was in the house. Officer Perkins then entered an upstairs bedroom.

8. As part of that protective sweep, once in the bedroom Officer Perkins spotted an open safe inside of an open closet and inside of that safe, saw what he suspected to be marijuana. Officer Perkins left the suspected contraband in the safe for collection, then exited the room, shouted down the stairs to the other officers present to let them know what he had found, and then "continued to sweep for narcotics." Officer Perkins found no other suspected contraband at this time.

9. According to the testimony of Sharon Chavis at the suppression hearing, the stairwell was slightly to the right of the front door and in the shape of an "L." From the entryway in which Ms. Cain had been arrested, it is impossible to see to the top of the stairwell as there is a landing at the corner of the "L" before the stairwell then turns 90 degrees left before finishing at the residence's second floor. It is impossible to see the door to the bedroom immediately to the right of the top of the staircase until ascending the stairwell as far as the landing, consequently Officer Perkins was not telling the court the truth.

10. Hoffmaster admitted the officers had no information that anyone other than Ms. Cain was in the house.

11. According to the testimony of Deputy U.S. Marshal Robert Hoffmaster at the suppression hearing, at this point, Ms. Cain was detained downstairs and was not

3

fully dressed.   Further, according to Deputy Hoffmaster, Ms. Cain needed socks out of a dresser upstairs.  While fetching socks for Ms. Cain, Officer Perkins discovered marijuana in a dresser drawer.[1]

12. According to the testimony of MPD Officer Todd Perkins at the suppression hearing, in accordance with MPD policy, "she [could not have been] in lockup without socks."  Ms. Cain did not ask Officer Perkins for socks but rather, while Officer Perkins was still upstairs, Deputy U.S. Marshal Hoffmaster yelled upstairs to Perkins to retrieve socks.  Officer Perkins then searched for Ms. Cain's socks in the dresser and while doing so, discovered more suspected cocaine in a drawer.  There is no testimony in the record that Ms. Cain directed the Officer's to a particular dresser in a particular room.

13. According to the testimony of MPD Detective Walter Gilmore at the suppression hearing, after this initial protective sweep was completed, he was then contacted by the officers on the scene and then responded to the scene.  While on the scene, Detective Gillmore spotted a paper plate with more suspected contraband on it underneath a nightstand in the upstairs bedroom.  Detective Gillmore believed that this plate was "partially in plain view."[2]  Detective Gillmore believed that MPD Officer John Salaone said that he had found the plate underneath a nightstand.  Putting aside the contents of the safe in the closet and the paper plate found underneath the nightstand, Detective Gillmore "would not have applied for a [search] warrant [for the home] based solely on the [contraband found in the] drawer."  After observing the suspected

---

[1] Hoffmaster testified he thought it was marijuana.
[2] The government in its motion stated that suspected cocaine was found under a dresser not a nightstand.

4

contraband in the drawer, on the paper plate, and in the safe, Detective Gillmore applied for a search warrant for the residence.

I. **The government's opposition never raised Inevitable Discovery and the facts asserted by the government in its motion impeach the government's own witnesses.**

14. According to the United States' Opposition to Defendant's Motion to Suppress filed on August 7, 2006, the following occurred:

> "[a]s the marshals began to put Ms. Cain in handcuffs, she indicated that her boyfriend Tyrone was upstairs….The marshals called and 'Tyrone' came down the stairs….As the defendant came out of the bedroom at the top pf [sic] the stairs, Officer Todd Perkins went up the stairs to perform a protective search of the area to make sure that nobody else was in the house who could interfere with or cause harm to the officers. Officer Perkins went into the bedroom just vacated by the defendant and looked in the closet to ensure that nobody was hiding there. When he looked in the closet, Officer Perkins observed a safe with the door open. Officer Perkins was able to see what he believed to be marijuana in plain view."

15. At no point prior to this October 6, 2006 pleading did the United States assert any factual predicate that would support a claim that the contraband in the upstairs bedroom would have been Inevitably Discovered regardless of any initial Fourth Amendment violation. .

16. The initial protective sweep of the upstairs bedroom of 229 54th Street NE, Washington, DC at which Mr. Loften resided was an illegal search conducted in violation of the Fourth Amendment. This court should now suppress all physical evidence recovered during that search other than the contraband found in the dresser.

**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING
DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

II. **This court should suppress all physical evidence for use at trial against Mr. Loften gathered on April 7, 2005 at 229 54th Street NE, Washington, DC**

> **because the initial protective sweep of the upstairs area of the house was an Unconstitutional search and all evidence subsequently recovered is fruit of that initial Fourth Amendment violation.**

The Fourth Amendment of the United States Constitution provides that the right of people to be secure in their persons against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.  Evidence obtained in violation of the Fourth, Fifth, and Sixth Amendments may not be introduced at trial.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961) (barring use in state courts of evidence seized in violation of 4th Amendment through the 14th Amendment); see also Weeks v. U.S., 232 U.S. 382, 398 (1914) (barring use in federal courts of evidence seized by federal officers in violation of the 4th Amendment).  Warrantless searches and seizures are presumptively unreasonable.  See Katz v. United States, 389 U.S. 347, 357 (1967).  There are very few exceptions to this time-honored rule.  Brown v. Illinois, 422 U.S. 590 (1975).  Furthermore, any evidence obtained as a result of an illegal search or seizure is fruit of the poisonous tree and must be suppressed.  Wong Sun v. United States, 371 U.S. 471 (1963).  In this case, although the police had an arrest warrant for Monica Cain, they initially searched the residence at 229 54th Street NE, Washington, DC without the authority of a search warrant.  Therefore, unless the government can show that any evidence obtained was obtained pursuant to one of the exceptions to the Fourth Amendment's warrant requirement, all such evidence must be excluded at trial.  See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

> a. **The United States cannot justify the search of the upstairs bedroom as a first-prong *Buie* search because the upstairs bedroom is not an area immediately adjoining the place of Ms. Cain's arrest from which an attack could have been immediately launched.**

6

In its Opposition to Defendant's Motion to Suppress filed on August 7, 2006, the United States attempted to justify the search of the upstairs bedroom of the house as a first-prong Buie search.[3] Under that narrow exception to the Fourth Amendment's warrant requirement, first laid out in Maryland v. Buie, 494 U.S. 325, 333 (1990) as an incident to a lawful arrest of an individual in a home, police officers can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 333 (1990); United States v. Ford, 56 F.3d 265, 268-69 (D.C. Cir. 1995). The purpose of this first-prong Buie search is to insure officer safety. To hold that the search of the upstairs bedroom in the instant case fits within the first-prong Buie exception to the Fourth Amendment's warrant requirement would be an unprecedented extension of the principles enunciated in Buie.

> **i. The evidence adduced at the hearing on Mr. Loften's motion to suppress does not support the conclusion that the upstairs bedroom was an area Immediately Adjoining the location of Ms. Cain's arrest where an attack could be immediately launched.**

The search the officers conducted of the upstairs bedroom is not analogous to the precautionary "look in closets and other spaces immediately adjoining the place of arrest" that Buie authorizes. In all cases in which the D.C. Circuit Court has upheld the legality of a first-prong Buie search, the individual arrestee was arrested either in a hallway adjacent to a bedroom or in one bedroom adjacent to another and the arresting officers then entered and looked inside that adjacent bedroom. See United States v. Thomas, 429 F.3d 282, 287 (D.C. Cir. 2005); In re Sealed Case, 153 F.3d 759, 763 (D.C. Cir. 1998) ("As he entered the small bedroom on the second floor, adjacent to the room in which he

---

[3] The government actually maintained in its motion that the search was justified under both prongs.

7

had apprehended defendant, [the officer] saw a clear plastic bag containing white rocks sitting on a television stand."); United States v. Ford, 56 F.3d 265, 270 (D.C. Cir. 1995) ("Because the arrest took place in the hallway, and the bedroom from which Ford emerged was immediately adjoining the hallway, Agent Godfrey could legitimately look in the bedroom for potential attackers."). Unlike the above-cited cases, the search of the upstairs bedroom in the instant case does not involve the search of an area "immediately adjoining" the downstairs location in which Ms. Cain was arrested. Mr. Loften unlike all the cases cited by the government was not a suspect or a defendant.

Both the testimony of Sharon Chavis and the photograph of the stairwell introduced into evidence by Mr. Loften clearly establish that an individual could not possibly see the upstairs bedroom until ascending the staircase significantly further than the first step and most likely not until reaching the stairwell's landing.

It simply cannot follow that because the upstairs bedroom adjoins the stairwell, that the officers were then permitted to ascend the stairs and sweep the upstairs bedrooms. Such logic would then permit the officers to secure any area adjoining the upstairs bedroom and so on and so on. This would permit a protective sweep of the entire house without any objective indicia of reasonable suspicion and would entirely negate the second prong of the Buie exception to the Fourth Amendment's warrant requirement which requires articulable facts. Ms. Cain was arrested at the front door. The upstairs bedroom is not an area that is immediately adjacent.

The instant case is factually similar to United States v. Curtis, 239 F.Supp.2d 1 (D.D.C. 2002). In Curtis, one Melvin was legitimately placed under arrest in his living room. The arresting officers then legitimately patted down Curtis, who was also present

8

in the residence.  During that pat-down the officers felt an object they believed to be a bag of marijuana, and the defendant Curtis then reached into his own pocket at the request of the officers and removed the marijuana and was then legitimately placed under arrest in the home's living room.  Id. at 1-2.  After the defendants Curtis and Melvin had been placed under arrest in the living room and handcuffed, both defendants and all four law enforcement officers were in the front center of the living room right by a pool table.  Two of the officers remained with the defendants while the other two officers then conducted a security sweep of the premises "to make sure there wasn't any other person in it that could harm myself or fellow officers."  Id. at 2 (quoting officer's testimony).  The ensuing search turned up contraband in two bedrooms down a hallway in the one-story apartment.  See id.  The court went on to hold that the search of the bedrooms down the hallway could not be justified as a first-prong Buie search:

> As Government Exhibit No. 1 (a diagram of the premises) shows, the living room was very large, covering at least one-third of the square footage of the apartment.  It was large enough to house a pool table.  Immediately adjacent to it was an open kitchen, but the bedrooms were down a hallway.  Unlike the living room closet or the kitchen, neither Bedroom No. 1 nor Bedroom No. 2 was a 'closet or other space immediately adjoining the place of arrest' (the living room), nor a place 'from which an attack could be immediately launched.'  Before they began the sweep, the officers had 'complete[d] the arrests' and handcuffed the defendants and could simply have 'depart[ed] the premises.'  Maryland v. Buie, 494 U.S. at 336; see United States v. Ford, 56 F.3d at 269 (once defendants were in custody, they 'no longer posed a threat to the police').  There was no justification for a sweep of such 'remote areas' as the bedrooms and the locked closet under the first prong of Buie. See In re Sealed Case, 96-3167, 153 F.3d at 769 (sweep of remote areas, not immediately adjoining place of arrest, must be based on articulable facts under the second prong).  Unless the first prong of the Buie protective sweep doctrine means that a small apartment may always be swept in its entirety without probable cause or reasonable suspicion that someone else might be in the apartment who could pose a danger, the sweep in this case must be limited to the living room, its closet and the open kitchen.

Curtis, 239 F.Supp.2d at 4.

The instant case is very similar to Curtis. First, the upstairs bedroom which the officers searched was not a "closet or other space immediately adjoining the place of [Ms. Cain's] arrest from which an attack could be immediately launched." Second, all the testimony adduced at the hearing on Mr. Loften's motion to suppress clearly established that before the arresting officers began their protective sweep, Ms. Cain had been arrested and Mr. Loften was already detained. It was the officer's decision that Ms. Cain needed socks, not Ms. Cain or Mr. Loften. If this was the law then police would **always** claim that the defendant needed additional clothing.[4] The government's argument now hinges upon socks, a completely unnecessary article of clothing considering the circumstances. The officers had completed the arrest of Ms. Cain and could simply have departed the premises. Given these facts, there was simply no justification for a protective sweep of the upstairs bedroom under the first prong of Buie.

For the same reasons the Curtis court cited, this court should now reject the United States' claim that the search of the upstairs bedroom in the instant case can be justified as a legitimate first-prong Buie search and should grant Mr. Loften's motion to suppress.

> b. **The United States cannot justify the search of the upstairs bedroom as a second-prong *Buie* search because the searching officers lacked any articulable facts which would warrant a reasonably prudent officer in believing that the upstairs bedroom harbored an individual posing a danger to the officers on the arrest scene.**

A second-prong Buie search may extend beyond spaces immediately adjoining the place of arrest but must be based upon "articulable facts which would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Thomas, 429 F.3d at 290. The officer's

---

[4] This is not an unusual claim for the police since most arrest warrants are executed in the morning.

10

awareness of the dangerousness of the arrested individual is irrelevant in terms of justifying a second-prong Buie sweep as that individual is under arrest and no longer poses a danger to the police.  See Henry, 48 F.3d at 1284.  Rather, the relevant inquiry is whether there exists an objective basis for the officers to fear for their safety after the arrest.  Id.

In United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) the D.C. Circuit Court found that uncontroverted testimony at the suppression hearing on the defendant's motion to suppress established that searching officers had an objective basis to fear for their safety after arresting the defendant Henry, and thus a second-prong Buie search was justified.  Id.  This determination was based upon the fact that an informant had advised officers that Henry would have weapons and that Henry's 'boys' or 'counterparts' might be with him, that Henry had been arrested just outside an open door, and that once Henry had been taken into custody he had been heard to yell back into the open door, "They got me."  Id. at 1284.

The instant case is readily distinguishable from Henry as the United States did not offer any testimony at the hearing on Mr. Loften's motion to suppress that would indicate that the arresting officers had any belief, objectively reasonable or not, that any individual other than Monica Cain was present in the home when Ms. Cain's arrest warrant was effected.  In fact, on cross examination, Deputy U.S. Marshal Hoffmaster admitted that the arresting officers had no information that anyone was in the house who posed a specific danger to the officers and that regardless of that lack of information, "We would check just to make sure."

11

The court should also note that in the event the court finds that Officer Perkins had lawfully ascended the stairwell to the point where he could spot Mr. Loften, spotting Mr. Loften does not suddenly give rise to an objectively reasonable suspicion that individuals other than Mr. Loften who may pose a threat to officers could be present in the upstairs area of the house. (Emphasis Added). Officer Perkins testified that he spotted Mr. Loften in the doorway to the upstairs bedroom from the first step. Officer Perkins did not testify that after having detained Mr. Loften he became aware of any articulable facts which would warrant a reasonably prudent officer in believing that anyone else posing a threat to the officers was upstairs. See Henry, 48 F.3d at 1284 (D.C. Cir. 1995).

Because the United States cannot justify the search of the upstairs bedroom as a legitimate first or second-prong Buie search, this court should grant Mr. Loften's motion to suppress.

    **II.    The United States cannot save this physical evidence from suppression with the Inevitable Discovery doctrine.**

        **a. The court should exercise its discretionary powers to find that the United States waived any Inevitable Discovery argument by failing to raise it at any point in its briefs.**

Under FED R. CRIM. P. 12(e):

"A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides" [with respect to any pleading or pretrial motion].

The United States filed its opposition to Mr. Loften's Motion to Suppress on August 7, 2006. In that motion, the United States failed to assert any factual predicate that would support a claim that the physical evidence would have been Inevitably Discovered regardless of any Fourth Amendment violations. The government never sought leave of the Court to Supplement its motion.

12

Rule 12(e) Fed. R. Crim. P. gives the court discretion to now deem this new unbriefed Inevitable Discovery argument waived and fairness gravitates in favor of the court's finding such. Had Inevitable Discovery been properly raised in the time allowed by the court Mr. Loften would not be waiting in jail so this issue can be briefed now. Had the government briefed this issue and the motion was denied Mr. Loften already have had a trial date set within Speedy Trial. The same considerations of fairness that underlie discovery and Rule 16 of the Federal Rules of Criminal Procedure would now suggest that the court should hold that the United States has waived any Inevitable Discovery argument by failing to properly raise it in any of its briefs.

> **b. Regardless of any waiver, the Inevitable Discovery doctrine does not save this physical evidence because it is overly speculative to assert that officers inevitably would have discovered the suspected contraband without reference to the initial illegal search. Furthermore, the United States has provided no evidence that any contraband other than that in the drawer would have been Inevitably Discovered.**

Even if the court does not deem the United States' Inevitable Discovery argument to have been waived, that doctrine can still not rescue the physical evidence in this case from suppression because of the initial illegal search.

The Inevitable Discovery doctrine holds that if the prosecution can establish that the evidence the defendant seeks to suppress and which was illegally obtained inevitably would have been discovered by lawful means, then that evidence can be received by the court regardless of any initial illegality. Nix v. Williams, 467 U.S. 431, 444 (1984). Inevitable Discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." Id., n.5. Only when the evidence in question "would inevitably have been discovered without reference to the

13

police error or misconduct," is the nexus between the evidence and the initial illegality overcome and does the evidence become admissible. Id. at 448.

There are four problems with the United States' Inevitable Discovery claim in the instant case. First, the officer's would not have knowledge of any specific dresser in any room had Officer Perkins not conducted an illegal search of the bedrooms on the second floor. The United States has failed to establish that Ms. Cain actually requested socks of her own accord. Officer Perkins testified specifically that Ms. Cain did not ask him for socks. Deputy U.S. Marshal Hoffmaster testified that Ms. Cain needed socks. However, neither officer's testimony established that Ms. Cain requested socks or that Ms. Cain would have requested socks without reference to the initial illegality. In fact, both officers testified that Ms. Cain could not have been brought to lockup without socks and that she needed them under MPD policy.

The United States offered no testimony suggesting that Ms. Cain consented to a search of her dresser drawers, let alone that such consent was voluntarily and unequivocally given as required by the Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Given this lack of evidence, the court cannot find that the United States has established that regardless of any initial illegalities, Ms. Cain would have asked the arresting officers for socks and the officers inevitably would have discovered contraband in her drawer as a result of that request.

Second, even if the court finds that the United States has established that Ms. Cain would have requested socks and the officers would have Inevitably Discovered contraband in Ms. Cain's drawer regardless of any initial illegality, the United States has offered no evidence to support the claim that the officers would have Inevitably

Discovered the alleged contraband in the safe in the closet or the contraband under dresser as an incident of their retrieving Ms. Cain's socks.  The United States offered no testimony on the physical layout of a second floor bedroom or where **a** safe inside a closet was located in relation to **a** dresser.  For these reasons, it simply requires too much speculation as to what would have or could have been viewed from a dresser in order for the court to find that the alleged contraband in the closet and in a dresser inevitably would have been discovered.

Third, even if Ms. Cain had requested socks, her request would have been equivalent at most to an extremely limited consent to search a specific dresser drawer for a pair of socks.  Such a consent is narrowly construed and would not have given the officers any right to broaden their search a closet.  For the same reason, a consent to search cannot be interpreted to give officers the right to conduct an incidental protective sweep.  Additionally, precedence suggests that any Inevitable Discovery claim based on a theory that an individual inevitably would have consented to a search following an initial illegality should be viewed pessimistically.  See United States v. Goree, 365 F.3d 1086, 1089 n.2 (D.C. Cir. 2004) ("We are dubious that such conjectural testimony is adequate to support applying the doctrine to this case.  Moreover, while the circuits disagree over the scope of the doctrine, neither this nor any other circuit has yet extended it as far as would be required to justify the gun's seizure here.")

Fourth, the court cannot find that Ms. Cain would have requested socks and that the officers would have Inevitably Discovered contraband without reference to the initial illegal search as required by Nix v. Williams, supra.

At the time Ms. Cain allegedly requested socks, the officers had already found the contraband in the safe in her closet. Ms. Cain must have been aware of this as Officer Perkins testified that after he found the suspected contraband in the safe, he shouted down to the officers downstairs about what he had found. Only after this initial illegal search and after the proverbial cat was out of the bag did Ms. Cain allegedly request that the officers fetch her socks from her drawer, a drawer in which she was presumably storing contraband. It requires speculation to claim that Ms. Cain would have requested socks and that the contraband in the safe and under either the nightstand or dresser would have been Inevitably Discovered without reference to the initial illegality in this case.

C.f. United States v. $639,500, 955 F.2d 712, 720 (D.C. Cir. 1992) ("Nix, in short, rested on the [Supreme] Court's judgment that the deterrent effects of the exclusionary rule reach the point of diminishing returns when, unknown to the officers engaging in illegal conduct, a separate line of lawful investigation would have come upon the same evidence.")

For the above reasons, the United States cannot save this physical evidence from suppression through the Inevitable Discovery doctrine.

WHEREFORE, for these reasons and any other reasons deemed meritorious by this Court, counsel would request that this Motion be GRANTED.

        Respectfully submitted,

        _____/s/_____
        Bernard S. Grimm, Esq.
        503 D Street N.W.
        Washington, D.C. 20001
        (202) 371-0300

**CERTIFICATE OF SERVICE**

  I hereby certify that a true and correct copy of the foregoing Motion was mailed, postage prepaid this ___ day of November 2006 to:

    Michael Truscott, Esq.
    Assistant United States Attorney
    555 4th Street, N.W.
    Washington, D.C. 20530


            _____/s/_____
            BERNARD S. GRIMM